# EXHIBIT 3

# EXHIBIT 3

## SECOND AMENDMENT TO LEASE
### (Lincoln Mall; Matteson, Illinois Property)

THIS SECOND AMENDMENT TO LEASE (this "Amendment") is effective as of August $\underline{5}$, by and among WEC 98C-5 LLC, a Texas limited liability company ("Landlord"), and CPS Department Stores, Inc., a Delaware corporation ("Tenant").

### WITNESSETH:

WHEREAS, Chicago Title & Trust Company, as Trustee ("Land Trustee") under a Trust Agreement dated June 15, 1985, and known as Trust No. 1085200, and Six Anchors Limited Partnership, a Maryland limited partnership currently known as Illinois Partners Limited Partnership, as beneficiary under the Trust, collectively as Landlord (the "Former Landlord"), and CPS Realty Partnership, an Illinois general partnership ("CPS Partnership"), as the Tenant, entered into a Lease dated October 31, 1985, relating to certain premises constituting a portion of the Lincoln Mall Shopping Center in Matteson, Illinois, as such premises are more fully described in said Lease (the "Original Lease");

WHEREAS, pursuant to that certain Order (1) Authorizing CPS Realty Partnership to Assume Certain Leases with Illinois Partners Limited Partnership, as Amended, and (2) Establishing Cure Default Procedure entered by the United States Bankruptcy Court for the Eastern District of Wisconsin on October 15, 1993 (the "Lease Assumption Order"), CPS Partnership assumed the Original Lease subject to the terms of the Letter Agreement (as hereinafter defined);

WHEREAS, as provided in the Fourth Amended Joint Plan of Reorganization in the Matter of P.A. Bergner & Co. Holding Company, *et al.*, as confirmed on October 15, 1993, by the United States Bankruptcy Court for the Eastern District of Wisconsin (the "Plan of Reorganization") and pursuant to that certain Assignment and Assumption of Leases, Ground Leases and Agreement dated October 29, 1993, by and among CPS Partnership, Chicago Title and Trust Company, as Trustee under Trust Agreement dated May 15, 1985, and known as Trust No.1083000 and CPS Holding Co. (formerly Carson Pirie Scott & Company), a Delaware corporation ("CPS Holding"), CPS Partnership assigned, conveyed, transferred and delivered its entire right, title and interest in, to and under the Original Lease to CPS Holding and CPS Holding assumed and agreed to perform all of the terms, covenants and conditions imposed on the lessee under the Original Lease;

WHEREAS, as provided in the Plan of Reorganization and pursuant to that certain Assignment and Assumption of Leases, Ground Leases and Agreement dated October 29, 1993, by and among CPS Holding and Tenant, CPS Holding assigned, conveyed, transferred and delivered its entire right, title and interest in, to and under the Original Lease to Tenant and Tenant assumed and agreed to perform all of the terms, covenants and conditions imposed on the lessee under the Original Lease;

WHEREAS, by Letter Agreement dated April 21, 1993, as amended by Letter Agreements dated May 26, 1993, June 25, 1993, July 27, 1993, August 20, 1993, September 7, 1993, and September 24, 1993, respectively (collectively, "Letter Agreement"), Illinois Partners Limited Partnership and CPS Partnership agreed upon certain amendments to the Original Lease to become effective as of August 1, 1993, which amendments were incorporated into an Amendment of Lease (the "First Amendment") entered into by and among the Land Trustee, Illinois Partners Limited Partnership, and Tenant (the Original Lease as so amended by the First Amendment is hereinafter referred to as the "Lease"); and

WHEREAS, Landlord has purchased the property constituting the Demised Premises (as defined in the Lease) from the Former Landlord effective as of the date of this Amendment and in connection with the Landlord's

purchase of such property Tenant has agreed to amend certain terms and provisions of the Lease as more fully set forth herein.

NOW, THEREFORE, for and in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, Landlord and Tenant do hereby agree as follows:

1.    Defined Terms. Except as otherwise defined herein, all terms used in this Amendment with their initial letters capitalized which have been defined in the Lease shall have the same meaning herein as set forth in the Lease.

2.    Amendments to Lease. The Lease is hereby modified and amended as follows:

2.1.    The last paragraph of Section 1 of the Lease is hereby amended to change the date "February 1, 2014" to be "January 31, 2024", thereby extending the termination of the Fixed Term set forth in Section 1 of the Lease from February 1, 2014, to January 31, 2024.

2.2.    Exhibit B-1 attached hereto is hereby substituted for Exhibit B-1 to the Lease.

2.3.    The definition of "Approved Independent Auditor" set forth in Section 2 of the Lease is hereby amended to read in its entirety as follows:

"Approved Independent Auditor: means an independent certified public accounting firm which, at the time in question, is considered to be a "Big Six" accounting firm."

2.4.    The definition of "Existing Mortgages" is hereby deleted from the Lease, and all references in the Lease to "Existing Mortgages" (including, without limitation, Exhibit H attached to the Lease) are hereby deleted.

2.5.    The definition of the term "Permitted Exceptions" contained in the Lease is hereby amended to read in its entirety as follows:

"Permitted Exceptions: all encumbrances, liens and other matters affecting title to or the use of the Demised Premises listed on Exhibit K attached hereto and made a part hereof, and any other such matters created by or the creation of which is consented to by or arises as a result of the acts or omissions of Tenant (except the Mortgage)."

2.6.    The Lease is hereby amended to add a new Exhibit K thereto which shall be in the same form as Exhibit K to this Amendment.

2.7    The Lease is hereby amended as follows to make reference to Proffitt's, Inc., a Tennessee corporation, in the following sections of the Lease:

(a)    A definition of "Proffitt's" is hereby added to the Lease immediately after the definition of "Permitted Exceptions" to read as follows:

-2-

"Proffitt's" means Proffitt's, Inc., a Tennessee corporation, its permitted successors and assigns."

(b) Subpart (f) of Section 10 of the Lease is hereby amended to delete the term "CPS" therefrom, and to substitute in its place the term "Proffitt's".

(c) The first paragraph of Section 15.2 of the Lease is hereby amended to delete the term "CPS" therefrom, and to substitute in its place the term "Proffitt's".

(d) Subpart (ii) of Section 29(c) of the Lease is hereby amended to delete the term "CPS" wherever such term appears therein, and to substitute in its place the term "Proffitt's".

(e) Section 29(d) of the Lease is hereby amended to delete the term "CPS" wherever it appears therein, and to substitute in its place the term "Proffitt's".

2.8.    The Lease is hereby amended to delete the requirement that Percentage Rent be paid pursuant thereto. The Lease is hereby amended as follows to effect said change:

(a) Section 2 of the Lease is hereby amended to delete the definitions of "Aggregate Basic Rent" and "Percentage Rent" therefrom.

(b) Except as hereinafter provided, Section 3.2 of the Lease is hereby deleted; provided, however, that Section 3.2.4 and 3.2.5 of the Lease are not deleted therefrom.

(c) The Lease is hereby amended by deleting Section 24.4 thereof.

(d) The Lease is hereby amended to delete references to "Percentage Rent" wherever they appear throughout the remainder of the Lease.

2.9.    Section 5 of the Lease is hereby amended to read in its entirety as follows:

"5.    No Counterclaim, Abatement, etc.  The Basic Rent, all additional rent and all other sums payable hereunder shall be paid without notice, demand, counterclaim, setoff, deduction or defense, and without abatement, suspension, deferment, diminution or reduction by reason of, and the obligations and liabilities of Tenant under this Lease shall not be affected by, any circumstance or occurrence whatsoever, including, without limitation, (a) any damage to or destruction of the Demised Premises or any part thereof (except as otherwise expressly provided in Section 19), (b) any restriction or prevention of or interference with any use of the Demised Premises or any part thereof (except as otherwise expressly provided in Section 19), (c) any Taking of the Demised Premises or any part thereof (except as otherwise expressly provided in Section 19), (d) any title defect or encumbrance or, except when caused solely by the act or acts of Landlord, any eviction or prospective eviction from the Demised Premises or any part thereof by title paramount or otherwise, (e) any bankruptcy, insolvency, reorganization, composition, adjustment, dissolution, liquidation or other like proceeding of or on the part of Landlord or any assignee of Landlord's equity in the Demised Premises or any action taken with respect to this Lease by any trustee or receiver of Landlord or of any such assignee, or by any court in any such proceeding, (f) any change, extension, waiver, indulgence or other action or omission in respect of any obligation or liability of Tenant, (g)

-3-

any claim which Tenant has or might have against Landlord, whether or not Tenant shall have had any notice or knowledge of the foregoing, or (h) the exercise of any remedy under the Mortgage (including, without limitation, foreclosure). Except as otherwise expressly provided in (d) above and in Section 19, Tenant waives all rights now or hereafter conferred by statute or otherwise to quit, terminate or surrender this Lease or the Demised Premises or any part thereof, or to any abatement, suspension, deferment, diminution, setoff or reduction of Basic Rent or additional rent on account of any occurrence. Landlord and Tenant agree that this Lease is a true lease and does not represent a financing arrangement."

2.10. Section 6 of the Lease is deleted in its entirety and the following new Section 6 is substituted in lieu thereof:

"6. Extension of Demised Term. Tenant shall have the right, at its option, to extend the Demised Term for five (5) separate, consecutive renewal terms of five (5) years each (each, an "Additional Extension"), the first for the period commencing February 1, 2024, and terminating January 31, 2029 ("First Extension"); the second for the period commencing February 1, 2029, and terminating January 31, 2034 ("Second Extension"); the third for the period commencing February 1, 2034, and terminating January 31, 2039 (the "Third Extension"); the fourth for the period commencing February 1, 2039, and terminating January 31, 2044 (the "Fourth Extension"); and the fifth for the period commencing February 1, 2044, and terminating January 31, 2049 (the "Fifth Extension"). Tenant's right to extend the Demised Term for each respective Additional Extension is expressly subject to the condition that an Event of Default shall not have occurred and be continuing at the time of Tenant's exercise of such right or at the commencement of the Additional Extension. The right to extend the Demised Term shall be exercisable by written notice to Landlord and shall be given (i) if for the First Extension, on or before February 1, 2022; if for the Second Extension, on or before February 1, 2027; if for the Third Extension, on or before February 1, 2032; if for the Fourth Extension, on or before February 1, 2037; and if for the Fifth Extension, on or before February 1, 2042; provided, that, if Tenant fails to timely give notice to Landlord of the extension of the Lease for any of the Additional Extensions on or before the date required in this section, then the date by which Tenant must give such notice for such Additional Extension shall be extended to the date that is twenty (20) days after Landlord has given Tenant notice that it has an option which it will lose if it does not exercise the option within twenty (20) days after such notice is given by Landlord to Tenant. The giving of each such notice shall have the effect, without further action of Landlord or Tenant, of extending the Demised Term for the period of the respective Additional Extension, and Tenant shall not thereafter be entitled to revoke such extension. If Tenant fails to extend the Demised Term for any particular Additional Extension, then all rights and options to extend the Demised Term with the regard to subsequent Additional Extensions shall expire and be null and void. During each Additional Extension, the terms and conditions of this Lease shall continue in full force and effect, except that the annual Basic Rent for each Additional Extension shall be in the amounts determined in accordance with the schedule set forth on Exhibit B-1 hereto."

2.11. Section 8 of the Lease is hereby amended by adding the phrase "and perform all obligations of the owner of the Demised Premises under" between the words "with" and "any Permitted Exceptions" in the last line of Section 8 of the Lease. Notwithstanding the foregoing, Tenant shall not be obligated to remove encroachments from the Demised Premises onto adjacent properties which are listed on Exhibit K hereto.

-4-

2.12.    Section 11.3 of the Lease is hereby amended to add a new paragraph at the end of such Section 11.3, which paragraph shall read in its entirety as follows:

"Tenant agrees that Tenant is obligated to and shall perform all obligations of the owner of the Demised Premises under and pay all expenses which the owner of the Demised Premises may be required to pay in accordance with the Operating Agreement or any other agreement or document included within the Permitted Exceptions. Tenant further covenants and agrees to indemnify, defend and hold harmless Landlord and Mortgagee against any claim, loss or damage suffered by Landlord or Mortgagee by reason of Tenant's failure to perform any obligations or pay any expenses as required under the Operating Agreement or any other agreement or document included within the Permitted Exceptions or comply with the terms and conditions as hereinabove provided during the Demised Term of this Lease. The obligations of Tenant under this section 11.3 relating to matters occurring during the Demised Term of this Lease will survive any termination of this Lease."

Notwithstanding the foregoing, Tenant shall not be obligated to remove encroachments from the Demised Premises onto adjacent properties which are listed on Exhibit K hereto.

2.13.    Section 12 of the Lease is hereby amended to add the following sentence at the end thereof:

"Tenant shall make its own arrangements for the installation and provision of all such utilities and Landlord shall not be responsible to furnish any utilities to the Demised Premises and shall not be liable for any interruption or failure of any such utilities."

2.14.    Section 18.1 of the Lease is hereby amended to add the words "and Mortgagee" immediately after the word "Landlord" on the second line of said Section 18.1.

2.15.    Section 18.1 of the Lease is hereby amended to add the following sentence at the end thereof:

"All insurance required by this Section 18.1 shall be issued by insurance companies having and maintaining a Standard and Poor's rating of "AA" or better and a general policy rating of "AA" or better and a financial class of "VI" or better by A.M. Best Company, Inc.'s Key Rating Guide."

2.16.    Section 18.2 of the Lease is hereby amended to add the phrase "Landlord and" between the words "by" and "Mortgagee" on the twenty-first (21ˢᵗ) line of said Section 18.2.

2.17.    Section 19.1(c) of the Lease is hereby amended to read in its entirety as follows:

"(c)    Total Taking.

(i)    In the event of a Total Taking during the Fixed Term, then the Tenant shall, on the date of such Total Taking (the date the sale of the Demised Premises is consummated in accordance with this Section 19.1(c) is referred to herein as the "Termination Date"), purchase the remaining portion of the Demised Premises and the award (or if no part of the Demised Premises shall remain, the entire award) for the applicable price (the "Purchase Price") computed in accordance with the schedule annexed hereto and marked Exhibit I plus all Basic Rent, additional rent and other amounts which may be due and owing under this Lease for the period prior to the Termination Date (the "Additions to Purchase Price"). This

-5-

Case: 1:20-cv-03970 Document #: 1-3 Filed: 07/07/20 Page 8 of 33 PageID #:104

Lease shall terminate on the date of the closing of the sale of the remaining portion of the Demised Premises under this Section 19.1(c).

(ii)     Title shall close and the Purchase Price and Additions to Purchase Price shall be paid as hereinafter provided and thereafter Tenant shall be entitled to and shall receive any and all awards with respect to such Total Taking and Landlord shall assign (or in case of any award previously made, deliver to Tenant on the Termination Date) such award as may be made with respect to the Demised Premises. Title shall close on the date of the Total Taking at noon at the local office of Landlord's counsel, or at such other time and place as the Landlord and Tenant may agree upon, and this Lease shall remain in full force and effect until the closing of title to the Property under this section 19.1(c). On the Termination Date Tenant shall pay the Purchase Price and Additions to Purchase Price by transferring immediately available funds to such account or accounts and in such bank or banks as Mortgagee or Landlord, in that order, shall designate, upon delivery to Tenant of a special warranty deed (or local equivalent) conveying the remaining portion of the Demised Premises and all other required documents including an assignment or delivery of any award in connection with such Total Taking. The special warranty deed (or local equivalent) shall convey title, free from encumbrances other than (A) Permitted Exceptions, (B) liens or encumbrances created or suffered by Tenant or arising by reason of the failure of Tenant to observe or perform any of the terms, covenants or agreements herein provided to be observed and performed by Tenant, and (C) any installments of Impositions then affecting the Demised Premises. The remaining portion of the Demised Premises shall be conveyed pursuant to this Section 19.1(c) "AS-IS". The Purchase Price and Additions to Purchase Price payable as hereinabove provided shall be charged or credited, as the case may be, on the Termination Date to reflect adjustments of Basic Rent paid or payable to and including the Termination Date, apportioned as of the Termination Date. Tenant shall pay all documentary stamps, conveyance, transfer, transaction, sales and like taxes required in connection with the purchase, regardless of who is required to pay such taxes under State or local law or custom (and Tenant shall also pay to Landlord any amount necessary to yield to Landlord the entire Purchase Price and Additions to Purchase Price if as a matter of the law of the State or locality such tax cannot be paid directly by Tenant). Landlord shall cause any Mortgage (or other liens and encumbrances created by Landlord which are not Permitted Exceptions) to be paid and released at the Closing on the Termination Date. At the Closing of the sale under this Section 19.1(c), (A) Tenant shall pay to Landlord the Purchase Price and all Additions to the Purchase Price, and (B) Landlord and Tenant will cooperate with each other by the filing of such certificates, reports or affidavits (1) as may be required by law to avoid withholding of a part of the Purchase Price to satisfy income or other tax requirements, or (2) as may reasonably be required by the title company or the other party to close the transaction as contemplated by this Section 19.1(c).

(iii)     In the event that during any Additional Extension a Total Taking shall occur, this Lease and the Term hereof shall terminate on the date of such Total Taking; and in such event the entire award to be made as a result of the Total Taking shall be paid to Mortgagee or to Landlord, in that order; provided, however, that in the event of a Total Taking during any Additional Extension, the Tenant shall be entitled to pursue an award on account of Tenant's leasehold estate hereunder to the extent and only to the extent that such award does

FILED: NEW YORK COUNTY CLERK 05/08/2018 04:39 PM          INDEX NO. 652246/2018

NYSCEF DOC. NO. 4     Case: 1:20-cv-03970 Document #: 1-3 Filed: 07/07/20 Page 9 of 33 PageID #:105          RECEIVED NYSCEF: 05/08/2018

not reduce the award to which Landlord is or would be entitled in connection with such Total Taking in the event that Tenant did not pursue such an award."

2.18.    The Lease is hereby amended to attach thereto a new Exhibit I which shall be in the form attached to this Amendment as Exhibit I.

2.19.    Section 19.1(d) of the Lease is hereby amended as follows:

(a)    The words "or Mortgagee, as the case may be," are hereby added immediately after the word "Landlord" where it appears in the first (1st) line of Section 19.1(d)(i); and

(b)    The words "or Mortgagee" shall be added immediately after the word "Landlord" where it appears on the second (2nd) line of Section 19.1(d)(i)(B).

2.20.    Section 19.1(e) of the Lease is hereby deleted, and a new Section 19.1(e) is substituted in its place which shall read as follows:

"(e)    Except with respect to an award or payment to which Tenant is entitled pursuant to the provisions of Sections 19.1(b) or 19.1(c) hereof, no agreement with any governmental authority in settlement of or under threat of any Taking shall be made by either Landlord or Tenant without the prior written consent of the other, and of the Mortgagee, if the Demised Premises are then subject to a Mortgage. Except in the event of a Total Taking as described in Section 19.1(c) above, in no event shall the Basic Rent, additional rent, or any other amount due under or with respect to this Lease be reduced in the event of any Taking."

2.21.    Section 19.2(a)(iii) is hereby amended by deleting the last sentence thereof.

2.22.    Section 19.4 of the Lease is hereby amended as follows:

(a)    Section 19.4(a) of the Lease is hereby amended to add the words "after August 1, 1999," between the words "time" and "and" on the first line thereof, and to insert the word "thereafter" after the word "time" and before the word "during" on the second line of such Section 19.4(a).

(b)    Section 19.4(a)(ii)(B) is hereby amended to read in its entirety as follows:

"(B)    Plat of survey of the Exchange Property on which the improvements thereon are shown in relation to the property lines (which survey shall comply with the standard survey requirements of Mortgagee)."

(c)    Section 19.4(a)(ii)(C) is hereby amended to read in its entirety as follows:

"(C)    Appraisals by members of the American Institute of Real Estate Appraisers in good standing having not less than ten (10) years experience in appraising commercial properties of the same or similar nature, size, use and regional location as the Demised Premises, demonstrating that as of a then reasonably current date (and in the event of a Taking or casualty, a date before such Taking or casualty) (i) the fair market value of the

Exchange Property is at least equal to that of the Demised Premises, and (ii) the expected fair market value of the Exchange Property as of the maturity date of the Mortgage is at least equal to the expected fair market value of the Demised Premises on such maturity date. All values to be determined under this paragraph (C) shall be determined on a vacant and available basis without, in any instance taking into account the existence of this Lease, or any anticipated amendment(s) thereto or substitute lease(s) to be entered into between Landlord and Tenant with respect to the proposed exchange of properties,"

(d)    The proviso at the end of the first sentence of Section 19.4(a)(ii)(D) is hereby amended to read in its entirety as follows:

"provided, however, Mortgagee's consent shall not be granted in any case where the Exchange Property has an operating history of less than two (2) years, and Landlord and Tenant acknowledge and agree that, in such case, this Lease shall remain in full force and effect."

(e)    Section 19.4(a)(ii)(K) is hereby amended to read in its entirety as follows:

"(K)    An Owners Policy and Mortgagee's Policy of title insurance (1970 ALTA-Form B, or such other form as may be requested by Landlord in its reasonable discretion) for the Exchange Property, containing only those exceptions approved by Landlord and with endorsements reasonably requested by Landlord, with coverage equal to or greater than $13,612,500.00," and

(f)    Section 19.4(a)(iii) is hereby amended to add the words "estoppel certificates and agreements from any guarantors of Tenant's obligations under this Lease confirming and ratifying that all guarantees of Tenant's obligations under this Lease shall continue in full force and effect," between the words "Lease," and "a" on the third line of such Section.

(g)    Section 19.4(d) of the Lease is hereby deleted.

2.23.    Section 20(d) of the Lease is hereby amended to read in its entirety as follows:

"(d)    [Deleted]."

2.24.    Section 20(g) of the Lease and the paragraph immediately following such Section 20(g) are hereby amended to read in their entireties as follows (provided, that this shall not amend the provision which was added at the end of Section 20 of the Lease by the First Amendment, which shall remain as therein provided at the end of said Section 20):

"(g)    if Proffitt's or any other guarantor of Tenant's obligations under this Lease shall avail itself or be subject to any of the events described in paragraphs (e) and (f) above;

then and in any such event Landlord at any time thereafter may: (i) terminate this Lease by giving Tenant ten (10) days written notice of Landlord's election to do so, whereupon the Demised Term of this Lease shall expire and terminate by limitation on the date stated in such notice (subject to the provisions of section 24 relating to the survival of Tenant's obligations) and all rights of Tenant under this Lease shall cease; (ii) terminate the right of Tenant to possession of the Demised Premises without terminating this Lease by giving ten (10) days written notice to Tenant that Tenant's right of possession shall end on the date stated in the notice, whereupon the right of Tenant to possession of the Demised Premises or any part thereof shall cease and terminate on the date stated in such notice; and (iii) pursue such other remedies as are available to Landlord at law or in equity on

account of such Event of Default. All costs and expenses incurred by or on behalf of Landlord, including, without limitation, reasonable attorneys' fees and expenses, occasioned by any Event of Default shall constitute additional rent hereunder. Anything to the contrary contained in this section 20 notwithstanding, if an Event of Default occurs under subsection (c) hereof which (i) is not a material default, (ii) is not an event which, if not cured, will constitute a default under a Mortgage, (iii) cannot result in Landlord being subject to any civil liability, as to which Tenant has not posted adequate security, or any criminal liability, and (iv) cannot result in the Demised Premises or any rent therefrom or any part thereof or interest therein being in imminent danger of being sold, encumbered, forfeited or lost, then in such event, Landlord shall not be entitled to terminate this Lease or Tenant's right to possession of the Demised Premises, but shall be entitled to pursue any other remedy available hereunder or at law or in equity, including, without limitation, its rights under section 31 hereof and its right to maintain an action for damages."

2.25.  Section 21 of the Lease is hereby amended to read in its entirety as follows:

"21.  Repossession, etc. by Landlord. At any time after the termination of this Lease or Tenant's right to possession pursuant to section 20 or otherwise, Tenant shall surrender possession of and vacate the Demised Premises immediately and deliver possession thereof to Landlord, and Landlord may enter upon and take complete and peaceful possession of the Demised Premises, with or without process of law, full and complete license to do so being hereby granted to Landlord, and Landlord may remove all persons and any and all property therefrom by force, summary proceedings, ejectment or otherwise. Landlord shall be under no liability for or by reason of any such entry, repossession or removal."

2.26.  The first two lines of Section 22 of the Lease are hereby amended to read in their entirety as follows:

"22.  Reletting. After the termination of this Lease or Tenant's right to possession pursuant to section 20 or otherwise, Landlord shall use"

Section 22 of the Lease is hereby further modified by adding the following paragraph to the end of such existing paragraph:

"In any such case the Landlord may make repairs, alterations and additions in or to the Demised Premises and redecorate with same to the extent deemed by Landlord necessary or desirable and in connection with any such reletting, change the locks to the Demised Premises, and Tenant shall, upon demand, pay the cost thereof together with Landlord's expenses of reletting. Landlord may collect the rents from any such reletting and apply the same first to the payment of the expenses of reentry, the attorneys' fees and costs incurred by Landlord in connection with any Event of Default and in connection with such reletting, the expenses of redecoration, repair and alterations and the expenses of reletting, and second to the payment of Basic Rent, additional rent and other sums herein provided to be paid by Tenant, and any excess or residue shall operate only as an offsetting credit against the amount of Basic Rent, additional rent and other sums as the same thereafter become due and payable hereunder, but the use of such offsetting credit to reduce such amounts due Landlord, if any, shall not be deemed to give Tenant any right, title or interest in or to such excess or residue, and any such excess or residue shall belong to Landlord solely. No such re-entry or repossession, repairs, alterations and additions, or reletting shall be construed as an eviction or ouster of the Tenant

-9-

or as an election on Landlord's part to terminate this Lease unless a written notice of such intention be given to Tenant, or shall operate to release the Tenant in whole or in part from any of the Tenant's obligations hereunder, and the Landlord may, at any time and from time to time, sue and recover judgment for any deficiencies from time to time remaining after the application from time to time of the proceeds of any such reletting. Landlord and Tenant agree that Landlord's actions in compliance with the terms of this section 22 shall constitute reasonable measure to mitigate the damages to Landlord resulting from an Event of Default."

2.27.   Section 24 of the Lease is hereby amended to read in its entirety as follows:

"24.   Survival of Tenant's Obligations; Damages.

24.1   Termination of Lease Not to Relieve Tenant of Obligations. No termination of Tenant's right of possession or termination of this Lease pursuant to section 20, and no repossession of the Demised Premises or any part thereof pursuant to section 21 or otherwise shall relieve Tenant of its liability and obligations under this section 24, all of which shall survive any such termination or repossession.

24.2   Damages - Termination of Possession. In the event of the termination of Tenant's right to possession of the Demised Premises without terminating this Lease, Tenant shall pay immediately to Landlord the Basic Rent, and all additional rent and other sums required to be paid by Tenant, including, without limitation, the Impositions, up to the time of such termination, as well as all other additional sums payable by the Tenant, or for which Tenant is liable or in respect of which Tenant has agreed to indemnify Landlord under any of the provisions of this Lease which may be then owing and unpaid for the period up to such termination of possession, and all costs and expenses, including court costs and attorneys' fees incurred by Landlord in the enforcement of its rights and remedies hereunder. Additionally, Landlord shall be entitled to recover as liquidated and final damages for loss of the bargain and not as a penalty the aggregate sum which at the time of such termination represents the excess, if any, of the then present value of the Basic Rent, additional rent and other sums to be paid by Tenant under this Lease for the remainder of the Demised Term, over the then present value of the then aggregate fair rental value of the Demised Premises for the balance of the Demised Term, such present value to be computed in each case on the basis of a per annum discount at seven and sixteen one-hundredths percent (7.16%) from the respective dates upon which such amounts would have been payable hereunder had this Lease not been terminated. If any statute or rule of law shall validly limit the amount of such liquidated final damages to less than the amount above agreed upon, Landlord shall be entitled to the maximum amount of such damages allowable under such statute or rule of law. In addition, Landlord shall have the right, from time to time, to recover from Tenant, and Tenant shall remain liable for, all additional rent and any other sums thereafter accruing as they become due under this Lease during the period from the date of such notice of termination of possession to the stated end of the Demised Term.

24.3   Damages - Termination of Lease. In the event of the termination of this Lease by Landlord as provided in section 20, Landlord shall be entitled to recover from Tenant all of the Basic Rent, additional rent and other sums to be paid by Tenant under this Lease accrued and unpaid for the period up to such termination date, as well as all other additional

-10-

sums payable by the Tenant, or for which Tenant is liable or in respect of which Tenant has agreed to indemnify Landlord under any of the provisions of this Lease which may be then owing and unpaid for the period up to such termination date, and all costs and expenses, including court costs and attorneys' fees incurred by Landlord in the enforcement of its rights and remedies hereunder, and in addition Landlord shall be entitled to recover as liquidated and final damages for loss of the bargain and not as a penalty the aggregate sum which at the time of such termination represents the excess, if any, of the then present value of the Basic Rent, additional rent and other sums to be paid by Tenant under this Lease for the remainder of the Demised Term (determined as if this Lease had not been terminated), over the then present value of the then aggregate fair rental value of the Demised Premises for the balance of the Demised Term (determined as if this Lease had not been terminated), such present value to be computed in each case on the basis of a per annum discount at seven and sixteen one-hundredths percent (7.16%) from the respective dates upon which such amounts would have been payable hereunder had this Lease not been terminated.

If any statute or rule of law shall validly limit the amount of such liquidated final damages to less than the amount above agreed upon, Landlord shall be entitled to the maximum amount of such damages allowable under such statute or rule of law."

2.28.    The second sentence of Section 26 of the Lease is hereby amended to read in its entirety as follows:

"No assignment of this Lease solely as security for obligations of Landlord shall release Landlord from any of its obligations under this Lease or constitute an assumption of any such obligations on the part of the assignee.

2.29    Section 29(a) of the Lease is hereby amended to read in its entirety as follows:

(a)    Except as provided in paragraphs (b) and (c) of this section 29, Tenant shall not assign or transfer this Lease or sublet all or any part of the Demised Premises without the prior written consent of Landlord and Mortgagee, such consents not to be unreasonably withheld; provided, however, that the prior written consent of Landlord and Mortgagee shall not be required for any assignment or transfer of this Lease at any time or from time to time, whether by operation of law or voluntary assignment, to another corporation or entity which shall acquire or succeed to all or substantially all of the assets, business and good will of Tenant and CPS.

2.30.    Section 39.1 of the Lease is hereby amended to add a new paragraph at the end of said Section which shall read in its entirety as follows:

"Tenant agrees that, if requested by Landlord, it shall enter into a Subordination, Non-Disturbance and Attornment Agreement reasonably requested by Mortgagee, provided such agreement contains provisions relating to non-disturbance in accordance with the provisions of the foregoing paragraph and Tenant hereby agrees for the benefit of any Mortgagee that Tenant will not, (i) without in each case the prior written consent of Mortgagee, which shall not be unreasonably withheld, conditioned or delayed, amend or modify the Lease (provided, however, Mortgagee in Mortgagee's sole discretion may withhold or condition its consent to any amendment or modification which would or could (A) alter in any way the amount or time for payment of any

-11-

Basic Rent, additional rent or other sum payable hereunder, (B) alter in any way the Tenant's obligations hereunder or materially diminish any such obligations, (C) result in any termination hereof prior to the end of the Demised Term, or (D) otherwise, in Mortgagee's reasonable judgment, affect the rights or obligations of Landlord or Tenant hereunder), or enter into any agreement with Landlord so to do, (ii) without the prior written consent of Mortgagee which may be withheld in Mortgagee's sole discretion, cancel or surrender or seek to cancel or surrender the Demised Term hereof, or enter into any agreement with Landlord to do so, or (iii) pay any installment of Basic Rent more than one (1) month in advance of the due date thereof or otherwise than in the manner provided for in this Lease."

2.31. Section 40 of the Lease is hereby amended to read in its entirety as follows:

"40. Tenant's Purchase Options.

40.1 General. Tenant shall have the option to purchase the Demised Premises on the following dates (each referred to herein as an "Effective Date"): (a) on July 31, 2008, (b) on July 31, 2014, (c) at the end of the Fixed Term on January 31, 2024, and (d) at the end of each Additional Extension which is properly exercised and becomes effective hereunder; provided, that all of Tenant's rights and options to purchase the Demised Premises under this section 40 of the Lease shall automatically terminate and be null and void if this Lease is terminated for any reason, regardless of whether or not such rights and options have previously been exercised. Tenant shall give written notice to Landlord of the exercise of such option not less than twenty-four (24) months and not more than twenty-seven (27) months prior to the respective Effective Date. Upon the giving of such notice, unless the exercise of the option is canceled pursuant to clause (ii) of the fourth sentence of section 40.2 or clause (f) of section 40.3, Tenant shall be obligated to purchase and Landlord shall be obligated to sell, the Demised Premises subject to the provisions set forth hereinbelow. The purchase price payable by Tenant under this section 40 (the "Option Purchase Price") shall be determined in accordance with the provisions set forth in section 40.2 and shall be paid to Landlord, less the principal amount of any Permitted Mortgages (as hereinafter defined) which are not released at Closing (as hereinafter defined) under this section 40 and less any other adjustments, all as hereinafter provided, in federal reserve funds deposited in Landlord's account at closing. Closing ("Closing") shall take place as of the Effective Date through an escrow established at Chicago Title and Trust Company, Chicago, Illinois, the terms and provisions of such escrow to be consistent with the terms and provisions hereof.

40.2 Calculation of Option Purchase Price. The Option Purchase Price for the Demised Premises pursuant to this section 40 shall be equal to the greater of (a) the amount specified on Exhibit J hereto for the respective Effective Date, or (b) the fair market value of the Demised Premises, without taking into account the existence of this Lease and based on then current appraisal methods. Tenant's notice to Landlord exercising the option to purchase shall be accompanied by an appraisal, prepared by an appraiser who shall be a member of the American Institute of Real Estate Appraisers of the National Association of Realtors, Chicago, Illinois (the "Institute"), familiar with the areas in which the Demised Premises are located, which shall state the opinion of such appraiser as to the fair market value of the Demised Premises as of a date thirty (30) months prior to the respective Effective Date; provided, that if for any reason the Institute is not in existence and functioning at the time of the exercise of Tenant's purchase option hereunder, then the appraisers referred to in this section 40 shall be members of such other nationally recognized appraiser

-12-

certifying or sanctioning organization as may be agreed upon by Landlord and Tenant or, if they cannot agree, as may be designated by the Senior Judge of the United States District Court for the Northern District of Illinois, which organization shall thereafter be the "Institute" for all purposes hereof. Within thirty (30) days after the receipt of Tenant's notice and such appraisal, Landlord may, by notice to Tenant, either accept the fair market value of the Demised Premises as set forth in such appraisal, and, if such fair market value is in excess of the amount specified on Exhibit J hereto for the respective Effective Date, as the Option Purchase Price for the Demised Premises, or reject such appraisal, in which event Landlord may obtain, no later than eighteen (18) months prior to the respective Effective Date, at Landlord's expense, and submit to Tenant, an appraisal by an appraiser who shall be a member of the Institute, such appraiser having been selected by the President of the Institute, familiar with the area in which the Demised Premises is located, which appraisal shall state the opinion of such appraiser as to the fair market value of the Demised Premises as of the date of the appraisal. Tenant shall then have the option, to be exercised by giving written notice to Landlord within five (5) days following receipt of Landlord's appraisal, to (i) accept, as the Option Purchase Price for the Demised Premises, the greater of the amount specified on Exhibit J hereto for the respective Effective Date or the fair market value of the Demised Premises as determined by the higher of the two appraisals, or (ii) cancel the exercise of its option to purchase the Demised Premises as of the respective Effective Date, or (iii) request a third appraisal. If Tenant requests a third appraisal, then an appraiser who shall be a member of the Institute, mutually acceptable to Landlord and Tenant, and familiar with the area in which the Demised Premises is located, shall promptly make an appraisal of the fair market value of the Demised Premises, at Tenant's expense, and shall state, in his opinion, such fair market value thereof, as of the date of such appraisal in accordance with the provisions of this section 40. If Landlord and Tenant cannot agree on such third appraiser within ten (10) days following Landlord's receipt of a request for a third appraisal, then the third appraiser shall be selected by the President of the Institute at the request of either party. Such appraisal shall be delivered to Landlord and Tenant at least fifteen (15) months prior to the respective Effective Date. Upon receipt of the third appraisal by the parties hereto, the Option Purchase Price of the Demised Premises shall be determined as follows: (1) if the third appraisal provided for hereunder is higher than both of the first two appraisals provided for in this section 40, then the Option Purchase Price for the Demised Premises shall be the greater of the amount specified on Exhibit J hereto for the respective Effective Date or the fair market value of the Demised Premises as determined by the higher of said first two appraisals; or (2) if the third appraisal is lower than both of the first two appraisals provided for in this section 40, then the Option Purchase Price for the Demised Premises shall be the greater of the amount specified on Exhibit J hereto for the respective Effective Date or the fair market value of the Demised Premises as determined by the lower of said first two appraisals; or (3) if the third appraisal is greater than the lower of said first two appraisals and less than the higher of said first two appraisals, then the Option Purchase Price for the Demised Premises shall be the greater of the amount specified on Exhibit J hereto for the respective Effective Date or the fair market value of the Demised Premises as determined by the third appraisal.

40.3   Other Terms and Conditions. Following exercise of the option by Tenant, the following terms and conditions, in addition to those set forth above, shall apply:

(a)   Landlord agrees to convey to Tenant at Closing by special warranty deed (or local equivalent) the Demised Premises free and clear of all liens and encumbrances other than (i) the Permitted Exceptions, (ii) the Permitted Mortgages (as hereinafter defined) other

-13-

than any Replacement Loan (as hereinafter defined) which shall be released at the Closing as hereinafter provided, (iii) liens or encumbrances created or suffered by Tenant or arising by reason of the failure of Tenant to observe or perform any of the terms, covenants or agreements herein provided to be observed and performed by Tenant, (iv) any installments of Impositions then affecting the Demised Premises, and (v) this Lease.

(b)     Any documentary, stamp, transfer, conveyance, transactions or similar taxes levied in connection with the foregoing conveyance of the Demised Premises shall be paid by Tenant.

(c)     At Closing, title to the Demised Premises shall be subject only to (i) the Permitted Exceptions, (ii) Mortgages, Assignments of Leases and Rents and related loan documents (collectively, the "Permitted Mortgages") securing (A) the loan to Landlord from Red Mountain Funding, L.L.C. or its successors and assigns, in the original principal amount of $13,612,500.00 (provided, that so long as Tenant has made all payments of Basic Rent, additional rent and other amounts due under this Lease, the unpaid principal and accrued interest of such loan shall be reduced to an amount not in excess of the Option Purchase Price on the respective Effective Date) which is secured by the Demised Premises (the "Red Mountain Loan") or (B) if the lien securing the Red Mountain Loan has been released, other loans which, so long as Tenant has made all payments of Basic Rent, additional rent and other amounts due under this Lease, shall be in an aggregate amount of unpaid principal and accrued interest not in excess of the Option Purchase Price as of the respective Effective Date (the "Replacement Loan") with respect to which Landlord has delivered to Tenant true and correct copies of the note, mortgage and assignment of leases and rents not less than two (2) years prior to the respective Effective Date and which are prepayable without premium or penalty as of the respective Effective Date, (iii) liens or encumbrances created or suffered by Tenant or arising by reason of the failure of Tenant to observe or perform any of the terms, covenants or agreements herein provided to be observed and performed by Tenant, (iv) any installments of Impositions then affecting the Demised Premises, and (v) this Lease. At Closing Landlord shall represent and warrant to Tenant by written instrument delivered to Tenant that Landlord is not in default under any of the Permitted Mortgages and the amount of the unpaid principal and accrued interest thereunder as of Closing. The Demised Premises shall be conveyed pursuant to this section 40 "AS-IS". Landlord represents and warrants that true and correct copies of the Note and Mortgage evidencing the Red Mountain Loan have been given to Tenant and that the substantive terms of the Red Mountain Loan shall not be changed without Tenant's prior consent. Any Replacement Loan shall be paid off out of the Option Purchase Price and the lien thereof released at Closing.

(d)     At Closing, Tenant shall be entitled to obtain, if then available, at its expense an ALTA Owner's Policy, Form B-1992 (or what is at Closing the nearest equivalent thereof if such Form B-1992 is no longer in use) of Chicago Title Insurance Company, or other title insurance company designated by Tenant, dated the date of the Closing, insuring Tenant in the amount of the Option Purchase Price that it owns good and marketable title to the Demised Premises subject only to the Permitted Exceptions, any Permitted Mortgages which are not released at Closing, liens or encumbrances created or suffered by Tenant or arising by reason of the failure of Tenant to observe or perform any of the terms, covenants or agreements herein provided to be observed and performed by Tenant, any installments of

-14-

Impositions then affecting the Demised Premises, this Lease, and the standard printed exceptions to the Owner's Policy then in use, including an exception(s) for matters which would be removed by obtaining a current survey, such Owner's Policy to have attached thereto the same endorsements as were furnished Landlord at the time of Landlord's purchase of the Demised Premises.

(e)     At Closing, Landlord shall convey to Tenant by good and sufficient Bill of Sale free and clear of all liens and encumbrances (other than those related to the Permitted Mortgages which are not released at Closing) the personal property conveyed to Landlord at the time of Landlord's purchase of the Demised Premises and any renewals or replacements thereof made by Tenant from time to time during the Demised Term less such parts or portions thereof as shall have been abandoned, lost or destroyed during Tenant's occupation and operation of the Demised Premises.

(f)     In the event that, following the exercise by Tenant of its option to purchase the Demised Premises and prior to Closing, the Demised Premises are destroyed or materially damaged by fire or other casualty, or the whole or any part thereof are taken through the exercise of eminent domain or a petition to so condemn is filed, Tenant shall have the option to either (i) cancel the exercise of its option to purchase the Demised Premises by giving Landlord written notice to that effect not more than fifteen (15) days following the date of such destruction, damage, condemnation or receipt by Tenant of notice as to the filing of such petition to condemn, in which event this Lease shall remain in full force and effect, or (ii) proceed to Closing in which event the Option Purchase Price shall not be reduced but Landlord shall pay to Tenant all insurance proceeds or condemnation awards received by Landlord in connection therewith and assign to Tenant all of its right, title and interest in and to any such awards or proceeds not yet paid.

(g)     At Closing, (i) interest on the Permitted Mortgages shall be prorated, prepaid interest being credited to Landlord and interest accrued but unpaid being credited to Tenant, and (ii) Tenant shall pay to Landlord all accrued but unpaid Basic Rent, additional rent and other amounts payable under the terms of this Lease up to and prorated as of the date of Closing.

(h)     At Closing, the interest of Landlord under the Operating Agreement for the Demised Premises and all insurance policies, certificates, licenses, guaranties, warranties and the like covering the Demised Premises and assigned to Landlord by Tenant shall be reassigned (to the extent assignable) to Tenant by good and sufficient instruments of assignment without representation, warranty or recourse whatsoever, and Tenant will assume and agree to perform, and indemnify Landlord with respect to, all obligations thereunder.

(i)     At or prior to Closing, Landlord and Tenant will cooperate with each other by the filing of such certificates, reports or affidavits (A) as may be required by law to avoid withholding of a part of the Purchase Price to satisfy income or other tax requirements, or (B) as may reasonably be required by the title company or the other party to close the transaction as contemplated by this section 40."

-15-

2.32. The Lease is hereby amended to add an Exhibit J thereto which shall be in the form of Exhibit J attached to this Amendment.

2.33. Section 41 of the Lease is hereby amended to read in its entirety as follows:

"41. Liability of Landlord. If Landlord, or any of its successors or assigns, shall fail to perform any covenant, term or condition of this Lease upon Landlord's part to be performed, Tenant's sole recourse shall be against the right, title and interest of Landlord in and to the Demised Premises, and the rents or other income from such property receivable by Landlord, subject, nevertheless, to the rights of any Mortgagee, and neither Landlord nor any successor or assign of Landlord nor any of the beneficiaries, trustees, general partners, limited partners, shareholders, officers or directors of Landlord or of any successor or assign of Landlord, shall be personally liable hereunder.

The term "Landlord" as used in this Lease so far as covenants or obligations on the part of Landlord are concerned, shall be limited to mean and include only the owner or owners of the Demised Premises or holder of the Mortgage in possession at the time in question of the Demised Premises and, without limiting the effect of any other provisions of this section 41, in the event of any transfer or transfers of the title of the Demised Premises, the Landlord herein named (and in case of any subsequent transfers or conveyances, the then grantor) shall be automatically freed and relieved from and after the date of such transfer and conveyance of all liability as respects the performance of any covenants or obligations on the part of Landlord contained in this Lease thereafter to be performed."

2.34. The Lease is hereby amended by adding a new Section 45 and a new Section 46 thereto which shall read in their entirety as follows:

"45.   Hazardous Substances.

(a)   Tenant agrees that it will not on, about, or under the Demised Premises, make, treat or dispose of any "hazardous substances" as that term is defined in the Comprehensive Environmental Response, Compensation and Liability Act, and the rules and regulations promulgated pursuant thereto, as from time to time amended, 42 U.S.C. § 9601 *et seq.* (the "Act"); but the foregoing shall not prevent the use of any hazardous substances in accordance with applicable laws and regulations. Tenant represents and warrants that it will at all times during the Demised Term comply with the Act and any other federal, state or local laws, rules or regulations governing "Hazardous Materials". "Hazardous Materials" as used herein shall mean all chemicals, petroleum, crude oil or any fraction thereof, hydrocarbons, polychlorinated biphenyls (PCBs), asbestos, asbestos-containing materials and/or products, urea formaldehyde, or any substances which are classified as "hazardous" or "toxic" under the Act; hazardous waste as defined under the Solid Waste Disposal Act, as amended 42 U.S.C. § 6901; air pollutants regulated under the Clean Air Act, as amended, 42 U.S.C. § 7401, *et seq.*; pollutants as defined under the Clean Water Act, as amended, 33 U.S.C. § 1251, *et seq.*, any pesticide as defined by Federal Insecticide, Fungicide, and Rodenticide Act, as amended, 7 U.S.C. § 136, *et seq.*, any hazardous chemical substance or mixture or imminently hazardous substance or mixture regulated by the Toxic Substances Control Act, as amended, 15 U.S.C. § 2601, et Seq., any substance listed in the United States Department

-16-

of Transportation Table at 45 CFR 172.101; any chemicals included in regulations promulgated under the above listed statutes; any explosives, radioactive material, and any chemical regulated by state statutes similar to the federal statutes listed above and regulations promulgated under such state statutes.

(b)     To the extent required by the Act and/or any federal, state or local laws, rules or regulations governing Hazardous Materials, Tenant shall, during the Demised Term, remove any hazardous substances (as defined in the Act) and Hazardous Materials (as defined above) whether now or hereafter existing on the Demised Premises and whether or not arising out of or in any manner connected with Tenant's occupancy of the Demised Premises during the Demised Term. Tenant shall and hereby does agree to defend, indemnify and hold Mortgagee and Landlord, their beneficiaries, trustees, members, managers, officers, directors, shareholders, partners and employees, harmless from and against any and all causes of actions, suits, demands or judgments of any nature whatsoever, losses, damages, penalties, expenses, fees, claims, costs (including, without limitation, response and remedial costs), and liabilities, including, but not limited to, reasonable attorneys' fees and costs, arising out of or in any manner connected with (i) the violation during the Demised Term of any applicable federal, state or local law, rule or regulation pertaining to health, safety or environmental matters with respect to the Demised Premises; (ii) the "release" or "threatened release" of or failure to remove, as required by this section 45, "hazardous substances" (as defined in the Act) and Hazardous Materials (as defined above) from the Demised Premises or any portion or portions thereof, now of hereafter existing during the Demised Term whether or not arising out of or in any manner connected with Tenant's occupancy of the Demised Premises during the Demised Term. The obligations of Tenant under this section 45(b) relating to matters occurring during the Demised Term of this Lease will survive any termination of this Lease.

(c)     The Tenant agrees that it will not install any underground storage tank at the Demised Premises without specific, prior written approval from the Landlord. The Tenant agrees that it will not store combustible or flammable materials on the Demised Premises in violation of the Act or any other federal, state or local laws, rules or regulations governing Hazardous Materials."

"46.     Right of First Refusal. Except in transactions consummated prior to August 1, 1999, Landlord shall not at any time during the Demised Term sell or convey or agree to sell or convey the Demised Premises to an unaffiliated third party without first having complied with the requirements of this section 46. If Landlord shall desire to sell or convey all or any portion or portions of the Demised Premises to an unaffiliated third party, Landlord shall obtain from such unaffiliated third party a bona fide arms' length written offer (the "Offer"), which Landlord desires to accept, to purchase all or such portion of the Demised Premises; and Landlord shall submit a written copy of the Offer to Tenant and shall give Tenant twenty (20) days within which to elect to purchase the portion of the Demised Premises which is the subject of the Offer (herein called the "Subject Premises") on the precise terms and conditions of the Offer (except that if the Offer shall be in whole or in part for consideration other than cash, Tenant shall have the right to pay in cash the fair market value of such non-cash consideration). If Tenant elects to so purchase the Subject Premises, Tenant shall give to Landlord written notice thereof ("Acceptance Notice") and closing shall

be held within thirty (30) days after the date of the Acceptance Notice, whereupon Landlord shall convey the Subject Premises to Tenant. At closing Landlord shall deliver to Tenant the Subject Premises in accordance with the terms of the Offer and, in any event, subject to all liens or encumbrances created or suffered by Tenant or arising by reason of the failure of Tenant to have observed or performed any term, covenant or agreement herein provided to be observed or performed by Tenant, the lien of any Impositions then affecting the Demised Premises, and this Lease. This right of first refusal shall continue as to all portions of the Demised Premises until such time as such portions shall have been sold by Landlord to the party making the Offer, provided Landlord has complied with its obligations hereunder. In the event Tenant shall elect not to so purchase the Subject Premises, Landlord may thereafter sell the Subject Premises which are the subject of the Offer only to the party making the Offer or its permitted assigns (as specified in such Offer) and only in accordance with the terms thereof, unless a further Offer is submitted to Tenant in accordance with this section 46. If such sale is not consummated within 365 days after notice of the Offer is given to Tenant, Landlord shall again be obligated to offer the Subject Premises to Tenant pursuant to the terms hereof before any sale to an unaffiliated third party Notwithstanding anything to the contrary herein, the provisions of this section 46 shall not apply to any sale or conveyance of the Leased Premises in foreclosure (or similar proceeding) of a bona fide mortgage or deed of trust or to any conveyance in lieu of foreclosure of such a mortgage or deed of trust.

If Landlord shall obtain an Offer with respect to a sale or conveyance of all or any portion of the Demised Premises, and sells the Demised Premises to Tenant, Tenant hereby acknowledges and consents that if the lien of the Mortgage is not released in connection with such sale of the Demised Premises, no merger of title shall occur and this Lease and any guaranty of this Lease will remain in full force and effect in accordance with their terms.

2.35. All references in the Lease to the "Beneficiary" of the Land Trust described therein shall hereafter be deemed to mean and refer to the Landlord.

2.36. The references to "section 11.2" in the introductory paragraph of Section 19.4(a) and in Section 29(d) of the Lease are hereby amended to read "section 11.1" in both such places.

3. No Further Effect. The Lease as amended and modified by this Amendment is hereby ratified by Landlord and Tenant. Except as expressly set forth in this Amendment, the Lease shall not be amended, modified, or supplemented and shall remain in full force and effect.

4. Consent. Tenant hereby consents to the assignment of the Lease by the Former Landlord to the Landlord and agrees that it shall perform all of its obligations under the Lease, as amended by this Amendment, to and for the benefit of the Landlord as fully as if it were the original Landlord named in the Lease, as amended hereby.

5. Addresses for Notice. Section 42 of the Lease is hereby amended to provide that (a) Landlord's address for notice shall be as follows:

-18-

WEC 98C-5 LLC
6750 LBJ Freeway, Suite 1100
Dallas, Texas 75240
Attn: Greg L. England
Facsimile No.: 972/716-6397

With a copy to:    Liechty & McGinnis, P.C.
10440 North Central Expressway, Suite 1100
Dallas, Texas 75231
Attn: Lorne O. Liechty, Esq.
Facsimile No.: 214/265-0615

and (b) Tenant's address for notice shall be as follows:

CPS Department Stores, Inc.
331 W. Wisconsin Avenue
Milwaukee, Wisconsin 53203
Attn: Senior Vice President Real Estate

With copies to:    CPS Department Stores, Inc.
5810 Shelby Oaks Drive
Memphis, Tennessee 38134
Attn: Eric Steven Faires

CPS Department Stores, Inc.
750 Lakeshore Parkway
Birmingham, Alabama 35211
Attn: General Counsel

CPS Department Stores, Inc.
750 Lakeshore Parkway
Birmingham, Alabama 35211
Attn: Lease Administration Manager

The foregoing address of the Landlord shall also be the address to which Basic Rent and all other amounts due to Landlord from Tenant under the Lease shall be paid, unless otherwise designated by Landlord pursuant to Section 3.1 of the Lease.

6.    Representations and Warranties of Tenant. As an inducement to Landlord to enter into this Amendment, Tenant hereby represents and warrants the following to Landlord with respect to the Lease (all references to the Lease in this Section 6 shall mean and refer to the Lease as the same is amended by this Amendment):

(a)    True and correct copies of the Original Lease and the First Amendment are attached to this Amendment. The Lease is in full force and effect; there are no amendments or modifications of any kind to the Original Lease except for the First Amendment and this Amendment; there are no other promises, agreements, understandings or commitments between Landlord and Tenant relating to the Demised Premises

-19-

FILED: NEW YORK COUNTY CLERK 05/08/2018 04:39 PM          INDEX NO. 652246/2018

NYSCEF DOC. NO. 4     Case: 1:20-cv-03970 Document #: 1-3 Filed: 07/07/20 Page 22 of 33 PageID #:118     RECEIVED NYSCEF: 05/08/2018

except as set forth in Section 6(m) below; and Tenant has not given Landlord any notice of termination thereunder. There is currently no exchange under Section 19.4 of the Lease pending or contemplated by Tenant.

(b)     Except for subleases or licenses entered into by Tenant in accordance with Section 29(b) of the Lease, there has not been and is now no subletting of the Demised Premises, or any part thereof, or assignment by Tenant of the Lease, or any rights therein, to any party and Tenant continues to be in occupancy of the Demised Premises. Tenant has not assigned, transferred, mortgaged, pledged or otherwise encumbered its interest in the Lease.

(c)     No uncured default, Event of Default, or breach by Tenant or, to Tenant's knowledge, by Landlord exists under the Lease, and no facts or circumstances exist that, with notice or the passage of time or both will or could constitute a default, Event of Default, or breach of Tenant or, to Tenant's knowledge, Landlord, under the Lease. Tenant has made no claim against Landlord alleging Landlord's default under the Lease.

(d)     Tenant has accepted the Demised Premises, and all common areas of the Demised Premises (including, without limitation, parking areas, sidewalks, access ways and landscaping), if any, are in compliance with the Lease and are satisfactory for Tenant's purposes.

(e)     To the best of Tenant's knowledge and belief, there are no rental, lease, or similar commissions payable with respect to the Lease.

(f)     Tenant is current with respect to, and is paying the full rent and other charges stipulated in the Lease (including, without limitation, Basic Rent and additional rent) and, to the extent any such rights are expressly provided in the Lease, Tenant has no knowledge of any currently existing rights of abatement, offsets, reductions, deductions, defenses or claims whatsoever; and Tenant has not prepaid any rent or other amounts to Landlord other than rent and other charges due and payable in the calendar month of this Amendment.

(g)     The undersigned representative of Tenant is duly authorized and fully qualified to execute this instrument on behalf of Tenant thereby binding Tenant.

(h)     Tenant has no outstanding options, rights of first refusal or rights of first offer to purchase the Demised Premises or any part thereof or any property of which the Demised Premises are a part, or any part thereof except as set forth in the Lease.

(i)     No voluntary actions or, to Tenant's best knowledge, involuntary actions are pending against Tenant under the bankruptcy laws of the United States or any state thereof.

(j)     There are no proceedings pending or, to Tenant's knowledge, threatened against Tenant before or by any court or administrative agency which, if adversely decided, could materially and adversely affect the financial conditions or operations of Tenant or any guarantor of Tenant's obligations under the Lease.

(k)     Tenant is the owner and holder of all right, title and interest in the leasehold estate created by the Lease.

-20-

(l)     Landlord does not hold a security deposit from Tenant in connection with the Lease.

(m)     That certain Letter Agreement dated April 21, 1993, between Illinois Partners Limited Partnership and CPS Realty Partnership has been incorporated into the First Amendment. Any rights of the Tenant to a setoff under the second paragraph and any other provision of such Letter Agreement are hereby declared to be null and void and of no further force and effect unless expressly included within the First Amendment; provided, however, that without limitation of any other representations and warranties set forth in this Section 6 or any other provisions of this Amendment or any provisions of the Lease, Landlord and Tenant acknowledge that the provisions of Paragraph 6 of said Letter Agreement have not been terminated, and agree that Landlord shall have no obligations or liabilities whatsoever with respect to or arising under said Paragraph 6.

(n)     To Tenant's knowledge, the loans secured by the Existing Mortgages referred to in the Original Lease have been paid in full.

7.      Memorandum of Lease. Landlord and Tenant agree to enter into a revised Memorandum of Lease reflecting the modifications to the terms of the Lease as set forth in this Amendment. The form of the Memorandum of Lease shall be reasonably acceptable to both Landlord and Tenant.

8.      Counterparts. To facilitate execution, this Amendment may be executed in as many counterparts as may be convenient or required. It shall not be necessary that the signature or acknowledgment of, or on behalf of, each party, or that the signature of all persons required to bind any party, or the acknowledgment of such party, appear on each counterpart. All counterparts shall collectively constitute a single instrument. It shall not be necessary in making proof of this Amendment to produce or account for more than a single counterpart containing the respective signatures of, or on behalf of, and the respective acknowledgments of, each of the parties hereto. Any signature or acknowledgment page to any counterpart may be detached from such counterpart without impairing the legal effect of the signatures or acknowledgments thereon and thereafter attached to another counterpart identical thereto except having attached to it additional signature or acknowledgment pages.

IN WITNESS WHEREOF, the undersigned have executed this Amendment effective as of the date first set forth above.

WEC 98C-5 LLC,
a Texas limited liability company

By:     Wolverine 98C-5, Inc., a Texas corporation,
        its sole manager

By: _____
Its: _____

-21-

CPS DEPARTMENT STORES, INC.,
a Delaware corporation

By:_____

Its:_____

D:\WOLVERIN\CARSON\PLINCOLN\LSEAMD2.2ND

## EXHIBIT B-1

### Annual Basic Rent

| Period | Annual Basic Rent Amount |
|---|---|
| 8/1/98 - 7/31/99 | $1,038,421.00 |
| 8/1/99 - 7/31/08 | $1,099,505.00 |
| (8/1/08 - 1/31/24) | $1,145,318.00 |
| First Extension<br>(2/1/24 - 1/31/29) | $1,179,677.00 |
| Second Extension<br>(2/1/29 - 1/31/34) | $1,214,037.00 |
| Third Extension<br>(2/1/34 - 1/31/39) | $1,248,396.00 |
| Fourth Extension<br>(2/1/39 - 1/31/44) | $1,282,756.00 |
| Fifth Extension<br>(2/1/44 - 1/31/49) | $1,317,115.00 |

## EXHIBIT I

## Condemnation Purchase Price Schedule

[attached hereto]

original loan $ 13,612,500 **EXHIBIT I**            **LINCOLN**

## Purchase Price Schedule

| Month | | Purchase Price | Month | | Purchase Price |
|---|---|---|---|---|---|
| 1 | 9/1/1998 $ | 13,612,500 | 47 | 7/1/2002 $ | 13,201,196 |
| 2 | 10/1/1998 $ | 13,607,445 | 48 | 8/1/2002 $ | 13,191,237 |
| 3 | 11/1/1998 $ | 13,605,066 | 49 | 9/1/2002 $ | 13,181,217 |
| 4 | 12/1/1998 $ | 13,599,967 | 50 | 10/1/2002 $ | 13,168,514 |
| 5 | 1/1/1999 $ | 13,597,542 | 51 | 11/1/2002 $ | 13,158,354 |
| 6 | 2/1/1999 $ | 13,595,102 | 52 | 12/1/2002 $ | 13,145,514 |
| 7 | 3/1/1999 $ | 13,584,535 | 53 | 1/1/2003 $ | 13,135,212 |
| 8 | 4/1/1999 $ | 13,582,015 | 54 | 2/1/2003 $ | 13,124,846 |
| 9 | 5/1/1999 $ | 13,576,778 | 55 | 3/1/2003 $ | 13,106,586 |
| 10 | 6/1/1999 $ | 13,574,210 | 56 | 4/1/2003 $ | 13,096,044 |
| 11 | 7/1/1999 $ | 13,568,927 | 57 | 5/1/2003 $ | 13,082,832 |
| 12 | 8/1/1999 $ | 13,561,236 | 58 | 6/1/2003 $ | 13,072,144 |
| 13 | 9/1/1999 $ | 13,553,497 | 59 | 7/1/2003 $ | 13,058,790 |
| 14 | 10/1/1999 $ | 13,543,015 | 60 | 8/1/2003 $ | 13,047,953 |
| 15 | 11/1/1999 $ | 13,535,164 | 61 | 9/1/2003 $ | 13,037,050 |
| 16 | 12/1/1999 $ | 13,524,572 | 62 | 10/1/2003 $ | 13,023,486 |
| 17 | 1/1/2000 $ | 13,516,607 | 63 | 11/1/2003 $ | 13,012,432 |
| 18 | 2/1/2000 $ | 13,508,593 | 64 | 12/1/2003 $ | 12,998,721 |
| 19 | 3/1/2000 $ | 13,495,156 | 65 | 1/1/2004 $ | 12,987,514 |
| 20 | 4/1/2000 $ | 13,487,010 | 66 | 2/1/2004 $ | 12,976,238 |
| 21 | 5/1/2000 $ | 13,476,131 | 67 | 3/1/2004 $ | 12,959,731 |
| 22 | 6/1/2000 $ | 13,467,868 | 68 | 4/1/2004 $ | 12,948,283 |
| 23 | 7/1/2000 $ | 13,456,875 | 69 | 5/1/2004 $ | 12,934,190 |
| 24 | 8/1/2000 $ | 13,448,493 | 70 | 6/1/2004 $ | 12,922,585 |
| 25 | 9/1/2000 $ | 13,440,059 | 71 | 7/1/2004 $ | 12,908,339 |
| 26 | 10/1/2000 $ | 13,428,900 | 72 | 8/1/2004 $ | 12,896,574 |
| 27 | 11/1/2000 $ | 13,420,345 | 73 | 9/1/2004 $ | 12,884,737 |
| 28 | 12/1/2000 $ | 13,409,068 | 74 | 10/1/2004 $ | 12,870,265 |
| 29 | 1/1/2001 $ | 13,400,391 | 75 | 11/1/2004 $ | 12,858,266 |
| 30 | 2/1/2001 $ | 13,391,661 | 76 | 12/1/2004 $ | 12,843,636 |
| 31 | 3/1/2001 $ | 13,374,886 | 77 | 1/1/2005 $ | 12,831,473 |
| 32 | 4/1/2001 $ | 13,365,998 | 78 | 2/1/2005 $ | 12,819,234 |
| 33 | 5/1/2001 $ | 13,354,398 | 79 | 3/1/2005 $ | 12,799,272 |
| 34 | 6/1/2001 $ | 13,345,383 | 80 | 4/1/2005 $ | 12,786,835 |
| 35 | 7/1/2001 $ | 13,333,660 | 81 | 5/1/2005 $ | 12,771,779 |
| 36 | 8/1/2001 $ | 13,324,518 | 82 | 6/1/2005 $ | 12,759,172 |
| 37 | 9/1/2001 $ | 13,315,319 | 83 | 7/1/2005 $ | 12,743,951 |
| 38 | 10/1/2001 $ | 13,303,416 | 84 | 8/1/2005 $ | 12,731,173 |
| 39 | 11/1/2001 $ | 13,294,088 | 85 | 9/1/2005 $ | 12,718,316 |
| 40 | 12/1/2001 $ | 13,282,058 | 86 | 10/1/2005 $ | 12,702,851 |
| 41 | 1/1/2002 $ | 13,272,598 | 87 | 11/1/2005 $ | 12,689,820 |
| 42 | 2/1/2002 $ | 13,263,079 | 88 | 12/1/2005 $ | 12,674,184 |
| 43 | 3/1/2002 $ | 13,245,588 | 89 | 1/1/2006 $ | 12,660,976 |
| 44 | 4/1/2002 $ | 13,235,904 | 90 | 2/1/2006 $ | 12,647,687 |
| 45 | 5/1/2002 $ | 13,223,526 | 91 | 3/1/2006 $ | 12,626,769 |
| 46 | 6/1/2002 $ | 13,213,705 | 92 | 4/1/2006 $ | 12,613,269 |

EXHIBIT I       LINCOLN

## Purchase Price Schedule

| Month | | Purchase Price | Month | | Purchase Price |
|---|---|---|---|---|---|
| 93 | 5/1/2006 $ | 12,597,177 | 142 | 6/1/2010 $ | 11,647,896 |
| 94 | 6/1/2006 $ | 12,583,494 | 143 | 7/1/2010 $ | 11,622,237 |
| 95 | 7/1/2006 $ | 12,567,224 | 144 | 8/1/2010 $ | 11,598,737 |
| 96 | 8/1/2006 $ | 12,553,357 | 145 | 9/1/2010 $ | 11,575,092 |
| 97 | 9/1/2006 $ | 12,539,404 | 146 | 10/1/2010 $ | 11,548,999 |
| 98 | 10/1/2006 $ | 12,522,871 | 147 | 11/1/2010 $ | 11,525,047 |
| 99 | 11/1/2006 $ | 12,508,730 | 148 | 12/1/2010 $ | 11,498,656 |
| 100 | 12/1/2006 $ | 12,492,014 | 149 | 1/1/2011 $ | 11,474,394 |
| 101 | 1/1/2007 $ | 12,477,683 | 150 | 2/1/2011 $ | 11,449,982 |
| 102 | 2/1/2007 $ | 12,463,263 | 151 | 3/1/2011 $ | 11,418,588 |
| 103 | 3/1/2007 $ | 12,441,319 | 152 | 4/1/2011 $ | 11,393,832 |
| 104 | 4/1/2007 $ | 12,426,675 | 153 | 5/1/2011 $ | 11,366,658 |
| 105 | 5/1/2007 $ | 12,409,469 | 154 | 6/1/2011 $ | 11,341,582 |
| 106 | 6/1/2007 $ | 12,394,629 | 155 | 7/1/2011 $ | 11,314,096 |
| 107 | 7/1/2007 $ | 12,377,233 | 156 | 8/1/2011 $ | 11,288,696 |
| 108 | 8/1/2007 $ | 12,362,194 | 157 | 9/1/2011 $ | 11,263,139 |
| 109 | 9/1/2007 $ | 12,347,062 | 158 | 10/1/2011 $ | 11,235,185 |
| 110 | 10/1/2007 $ | 12,329,382 | 159 | 11/1/2011 $ | 11,209,299 |
| 111 | 11/1/2007 $ | 12,314,048 | 160 | 12/1/2011 $ | 11,181,023 |
| 112 | 12/1/2007 $ | 12,296,170 | 161 | 1/1/2012 $ | 11,154,803 |
| 113 | 1/1/2008 $ | 12,280,632 | 162 | 2/1/2012 $ | 11,128,421 |
| 114 | 2/1/2008 $ | 12,264,997 | 163 | 3/1/2012 $ | 11,097,449 |
| 115 | 3/1/2008 $ | 12,244,388 | 164 | 4/1/2012 $ | 11,070,713 |
| 116 | 4/1/2008 $ | 12,228,530 | 165 | 5/1/2012 $ | 11,041,611 |
| 117 | 5/1/2008 $ | 12,210,142 | 166 | 6/1/2012 $ | 11,014,531 |
| 118 | 6/1/2008 $ | 12,194,073 | 167 | 7/1/2012 $ | 10,985,093 |
| 119 | 7/1/2008 $ | 12,175,480 | 168 | 8/1/2012 $ | 10,957,665 |
| 120 | 8/1/2008 $ | 12,155,390 | 169 | 9/1/2012 $ | 10,930,067 |
| 121 | 9/1/2008 $ | 12,135,178 | 170 | 10/1/2012 $ | 10,900,126 |
| 122 | 10/1/2008 $ | 12,112,426 | 171 | 11/1/2012 $ | 10,872,174 |
| 123 | 11/1/2008 $ | 12,091,949 | 172 | 12/1/2012 $ | 10,841,886 |
| 124 | 12/1/2008 $ | 12,068,940 | 173 | 1/1/2013 $ | 10,813,575 |
| 125 | 1/1/2009 $ | 12,048,194 | 174 | 2/1/2013 $ | 10,785,089 |
| 126 | 2/1/2009 $ | 12,027,320 | 175 | 3/1/2013 $ | 10,749,992 |
| 127 | 3/1/2009 $ | 11,999,141 | 176 | 4/1/2013 $ | 10,721,114 |
| 128 | 4/1/2009 $ | 11,977,965 | 177 | 5/1/2013 $ | 10,689,926 |
| 129 | 5/1/2009 $ | 11,954,276 | 178 | 6/1/2013 $ | 10,660,678 |
| 130 | 6/1/2009 $ | 11,932,823 | 179 | 7/1/2013 $ | 10,629,129 |
| 131 | 7/1/2009 $ | 11,908,864 | 180 | 8/1/2013 $ | 10,599,506 |
| 132 | 8/1/2009 $ | 11,887,131 | 181 | 9/1/2013 $ | 10,569,700 |
| 133 | 9/1/2009 $ | 11,865,264 | 182 | 10/1/2013 $ | 10,537,608 |
| 134 | 10/1/2009 $ | 11,840,903 | 183 | 11/1/2013 $ | 10,507,421 |
| 135 | 11/1/2009 $ | 11,818,751 | 184 | 12/1/2013 $ | 10,474,957 |
| 136 | 12/1/2009 $ | 11,794,112 | 185 | 1/1/2014 $ | 10,444,384 |
| 137 | 1/1/2010 $ | 11,771,671 | 186 | 2/1/2014 $ | 10,413,621 |
| 138 | 2/1/2010 $ | 11,749,093 | 187 | 3/1/2014 $ | 10,376,456 |
| 139 | 3/1/2010 $ | 11,719,364 | 188 | 4/1/2014 $ | 10,345,275 |
| 140 | 4/1/2010 $ | 11,696,463 | 189 | 5/1/2014 $ | 10,311,844 |
| 141 | 5/1/2010 $ | 11,671,094 | 190 | 6/1/2014 $ | 10,280,265 |

## EXHIBIT I                    LINCOLN

### Purchase Price Schedule

| Month | | Purchase Price | Month | | Purchase Price |
|---|---|---|---|---|---|
| 191 | 7/1/2014 | $ 10,246,446 | 240 | 8/1/2018 | $ 8,365,037 |
| 192 | 8/1/2014 | $ 10,214,463 | 241 | 9/1/2018 | $ 8,321,454 |
| 193 | 9/1/2014 | $ 10,182,284 | 242 | 10/1/2018 | $ 8,275,948 |
| 194 | 10/1/2014 | $ 10,147,880 | 243 | 11/1/2018 | $ 8,231,816 |
| 195 | 11/1/2014 | $ 10,115,290 | 244 | 12/1/2018 | $ 8,185,775 |
| 196 | 12/1/2014 | $ 10,080,487 | 245 | 1/1/2019 | $ 8,141,087 |
| 197 | 1/1/2015 | $ 10,047,481 | 246 | 2/1/2019 | $ 8,096,124 |
| 198 | 2/1/2015 | $ 10,014,272 | 247 | 3/1/2019 | $ 8,046,053 |
| 199 | 3/1/2015 | $ 9,974,882 | 248 | 4/1/2019 | $ 8,000,503 |
| 200 | 4/1/2015 | $ 9,941,225 | 249 | 5/1/2019 | $ 7,953,082 |
| 201 | 5/1/2015 | $ 9,905,384 | 250 | 6/1/2019 | $ 7,906,960 |
| 202 | 6/1/2015 | $ 9,871,298 | 251 | 7/1/2019 | $ 7,858,980 |
| 203 | 7/1/2015 | $ 9,835,039 | 252 | 8/1/2019 | $ 7,812,278 |
| 204 | 8/1/2015 | $ 9,800,520 | 253 | 9/1/2019 | $ 7,765,287 |
| 205 | 9/1/2015 | $ 9,765,788 | 254 | 10/1/2019 | $ 7,716,462 |
| 206 | 10/1/2015 | $ 9,728,900 | 255 | 11/1/2019 | $ 7,668,881 |
| 207 | 11/1/2015 | $ 9,693,726 | 256 | 12/1/2019 | $ 7,619,481 |
| 208 | 12/1/2015 | $ 9,656,408 | 257 | 1/1/2020 | $ 7,571,301 |
| 209 | 1/1/2016 | $ 9,620,787 | 258 | 2/1/2020 | $ 7,522,825 |
| 210 | 2/1/2016 | $ 9,584,947 | 259 | 3/1/2020 | $ 7,471,057 |
| 211 | 3/1/2016 | $ 9,545,073 | 260 | 4/1/2020 | $ 7,421,963 |
| 212 | 4/1/2016 | $ 9,508,766 | 261 | 5/1/2020 | $ 7,371,090 |
| 213 | 5/1/2016 | $ 9,470,344 | 262 | 6/1/2020 | $ 7,321,379 |
| 214 | 6/1/2016 | $ 9,433,576 | 263 | 7/1/2020 | $ 7,269,906 |
| 215 | 7/1/2016 | $ 9,394,706 | 264 | 8/1/2020 | $ 7,219,571 |
| 216 | 8/1/2016 | $ 9,357,472 | 265 | 9/1/2020 | $ 7,168,926 |
| 217 | 9/1/2016 | $ 9,320,008 | 266 | 10/1/2020 | $ 7,116,543 |
| 218 | 10/1/2016 | $ 9,280,460 | 267 | 11/1/2020 | $ 7,065,263 |
| 219 | 11/1/2016 | $ 9,242,521 | 268 | 12/1/2020 | $ 7,012,261 |
| 220 | 12/1/2016 | $ 9,202,511 | 269 | 1/1/2021 | $ 6,960,338 |
| 221 | 1/1/2017 | $ 9,164,092 | 270 | 2/1/2021 | $ 6,908,095 |
| 222 | 2/1/2017 | $ 9,125,436 | 271 | 3/1/2021 | $ 6,851,407 |
| 223 | 3/1/2017 | $ 9,081,097 | 272 | 4/1/2021 | $ 6,798,492 |
| 224 | 4/1/2017 | $ 9,041,929 | 273 | 5/1/2021 | $ 6,743,899 |
| 225 | 5/1/2017 | $ 9,000,722 | 274 | 6/1/2021 | $ 6,690,321 |
| 226 | 6/1/2017 | $ 8,961,058 | 275 | 7/1/2021 | $ 6,635,083 |
| 227 | 7/1/2017 | $ 8,919,368 | 276 | 8/1/2021 | $ 6,580,834 |
| 228 | 8/1/2017 | $ 8,879,204 | 277 | 9/1/2021 | $ 6,526,251 |
| 229 | 9/1/2017 | $ 8,838,791 | 278 | 10/1/2021 | $ 6,470,033 |
| 230 | 10/1/2017 | $ 8,796,372 | 279 | 11/1/2021 | $ 6,414,767 |
| 231 | 11/1/2017 | $ 8,755,448 | 280 | 12/1/2021 | $ 6,357,884 |
| 232 | 12/1/2017 | $ 8,712,532 | 281 | 1/1/2022 | $ 6,301,926 |
| 233 | 1/1/2018 | $ 8,671,092 | 282 | 2/1/2022 | $ 6,245,623 |
| 234 | 2/1/2018 | $ 8,629,396 | 283 | 3/1/2022 | $ 6,185,247 |
| 235 | 3/1/2018 | $ 8,582,294 | 284 | 4/1/2022 | $ 6,128,225 |
| 236 | 4/1/2018 | $ 8,540,051 | 285 | 5/1/2022 | $ 6,069,632 |
| 237 | 5/1/2018 | $ 8,495,849 | 286 | 6/1/2022 | $ 6,011,897 |
| 238 | 6/1/2018 | $ 8,453,073 | 287 | 7/1/2022 | $ 5,952,610 |
| 239 | 7/1/2018 | $ 8,408,352 | 288 | 8/1/2022 | $ 5,894,154 |

## EXHIBIT I    LINCOLN

### Purchase Price Schedule

| Month | | | Purchase Price |
|---|---|---|---|
| 289 | 9/1/2022 | $ | 5,835,337 |
| 290 | 10/1/2022 | $ | 5,774,997 |
| 291 | 11/1/2022 | $ | 5,715,445 |
| 292 | 12/1/2022 | $ | 5,654,390 |
| 293 | 1/1/2023 | $ | 5,594,095 |
| 294 | 2/1/2023 | $ | 5,533,428 |
| 295 | 3/1/2023 | $ | 5,469,085 |
| 296 | 4/1/2023 | $ | 5,407,647 |
| 297 | 5/1/2023 | $ | 5,344,755 |
| 298 | 6/1/2023 | $ | 5,282,551 |
| 299 | 7/1/2023 | $ | 5,218,913 |
| 300 | 8/1/2023 | $ | 5,155,932 |
| 301 | 9/1/2023 | $ | 5,092,564 |
| 302 | 10/1/2023 | $ | 5,027,792 |
| 303 | 11/1/2023 | $ | 4,963,633 |
| 304 | 12/1/2023 | $ | 4,898,092 |
| 305 | 1/1/2024 | $ | 4,833,134 |

Case: 1:20-cv-03970 Document #: 1-3 Filed: 07/07/20 Page 31 of 33 PageID #:127

## EXHIBIT J

## Minimum Option Purchase Price

The amount specified in subpart (a) of the first sentence of section 40.2 of the Lease shall be the following respective amounts for the respective Effective Dates:

| | | |
|---|---|---|
| 1. | For the Effective Date of July 31, 2008: | $13,271,618.00; |
| 2. | For the Effective Date of July 31, 2014: | $11,316,469.00; and |
| 3. | For the Effective Date of January 31, 2024, and any Effective Date thereafter: | $6,117,010.00. |

FILED: NEW YORK COUNTY CLERK 05/08/2018 04:39 PM    INDEX NO. 652246/2018

NYSCEF DOC. NO. 4    Case: 1:20-cv-03970 Document #: 1-3 Filed: 07/07/20 Page 32 of 33 PageID #:128    RECEIVED NYSCEF: 05/08/2018

## EXHIBIT K

### Permitted Exceptions

1.  Taxes for 1997 and 1998, and subsequent years.

2.  Amended and Restated Short Form of Lease and of Option to Purchase by and between WEC 98C-5 LLC, a Texas limited liability company, as Landlord, and CPS Department Stores, as Tenant, evidencing that certain unrecorded lease between Chicago Title and Trust Company, as Trustee under a Trust Agreement dated June 15, 1985 (as amended, modified or assigned, the "Lease"), and known as Trust No. 1085200 ("Trust") and Six Anchors Limited Partnership, a Maryland limited partnership, collectively as Landlord, and CPS Realty Partnership an Illinois general partnership ("CPS Realty Partnership"), as Tenant, as amended by (i) Amendment of Lease dated effective as of August 1, 1993, but executed on February 1, 1994, between Trust and Illinois Partners Limited Partnership (formerly named Six Anchors Limited Partnership), a Maryland limited partnership ("Illinois Partners"), as Landlord, and CPS Department Stores, Inc., a Delaware corporation ("CPS Department Stores"), as successor to CPS Realty Partnership, as Tenant, and (ii) Second Amendment to Lease dated as of July __, 1998, by and between WEC 98C-5 LLC, a Texas limited liability company, as successor to Trust and Illinois Partners, as Landlord, and CPS Department Stores, as Tenant; the transfer of interest from CPS Realty Partnership to CPS Holding Co. and to CPS Department Stores being evidenced by Assignments and Assumptions of Leases, Ground Leases and Agreements being recorded in Document Nos. 03013980 and 03013983, Cook County, Illinois.

3.  Easement over the North 70 feet (except that part taken for Lincoln Highway) of the West 66 feet of the East 483 feet of the Southwest 1/4 of Section of Section 22, Township 35 North, Range 13 East of the Third Principal Meridian, in Cook County, Illinois, to construct and maintain a 16 inch water main and appurtenances thereto, together with right of access for the purpose of reconstruction, repair, maintenance or operation of the utility, as grant to the Village of Matteson, by easement Agreement dated November 25, 1969 and recorded December 12, 1969 as Document 21036085.

4.  Grant recorded November 19, 1959 as Document 17716707 to Northern Illinois Gas Company, granting the right to lay, maintain, operate, renew and remove a gas main over, under, along and across the North 50 feet of the Northwest 1/4 of the Southwest 1/4 of Section 22, Township 35 North, Range 13 East of the Third Principal Meridian, in Cook County, Illinois.

5.  Rights of the Public, State of Illinois, and the Village of Matteson in and to that part of the land dedicated for Lincoln Highway.

6.  A perpetual easement for the sole purpose of drainage in, upon and over the following described land:

    That part of the Southwest 1/4 of Section 22, Township 35 North, Range 13 East of the Third Principal Meridian, in Cook County, Illinois, being a 35 foot strip of land, lying equidistant about the following described centerline:

    Beginning at a point on the East line of Cicero Avenue, distant 1454.12 feet South of the Northwest corner of said Southwest 1/4, thence East, at right angles to said East line, a distance of 206.14 feet to a point of curvature; thence Southeasterly along a curve, concave Southwesterly, with a radius of 50 feet and a central angle of 60 degrees, a distance of 52.36 feet to a point of tangency; thence Southwesterly along a line tangent to the last described curve at that last described point, a distance of 555.14 feet; thence Southeasterly along a line forming an angle of 5 degrees to the left of the last described course a distance of 213.72 feet to the point of termination; and a license to construct a temporary drainage ditch from the East

end of the above described land to the nearest practical point of natural drainage, as created by Easement Agreement between a La Salle National Bank, Trust No. 40798, and State of Illinois acting by and through its Department of Public Works and Buildings, dated December 10, 1970 and recorded March 29, 1971 as Document 21433856, and the terms, limitations, conditions, reservation and covenants contained therein.

Amended by instrument recorded September 9, 1977 as Document 24099069.

7.  Grant for utility purposes made by J. Wesley McCormak, Inc. to the Illinois Bell Telephone Company, dated November 3, 1952 and recorded April 6, 1953 as Document 15584692, creating an easement over, upon, etc., a strip of land 1 rod wide parallel with and adjacent to and North of the Northerly right-of-way line of Michigan Central Railroad, being the southerly 1 rod of part of the Southwest 1/4 of Section 22 (Railroad Property) and except the East 75 feet by metes and bounds, and upon, over and across public roads and streets adjoining the said property with right of ingress and egress thereto.

8.  Easements and Agreements contained in that certain Reciprocal Construction Operation and Easement Agreement dated March 7, 1972, and recorded March 14, 1972 as Document 21846183, as amended by Easement Agreement recorded on March 29, 1971, as Document No. 21433856, and by Document No. 24099069.

    Assigned from Carson Pirie Scott & Company and Lincoln-Cicero Corporation, to Chicago Title and Trust Company, as Trustee under Trust No. 1085200 by Document 85261569.

    Reassigned from Chicago Title and Trust Company, as Trustee under Document No. 1085200 to Carson Pirie Scott & Company and CPS Realty Partnership as Document 85261570.

9.  Easement over Parcel 1 as created by Total Site Agreement dated March 7, 1972 and recorded March 24, 1972 as Document 21846182, as Amended by Easement Agreement recorded on March 29, 1971, as Document No. 21433856, and by Document No. 24099069.

10. Memorandum of Lincoln Mall Central Plan Agreement dated July 23, 1973 and recorded March 5, 1974 as Document 22645325 made by and between Chicago Title and Trust Company, a corporation of Illinois, as Trustee under Trust Agreement dated June 4, 1971 and known as Trust No. 57420 and Carson Pirie Scott & Company, a corporation of Delaware.

11. A perpetual easement for the purpose of installation, operation, maintenance and removal of a storm sewer as created by Grant dated January 17, 1975 and recorded June 2, 1975 as Document 23100174.

12. Agreement made by and between Chicago Title and Trust Company, a corporation of Illinois, as Trustee under Trust Agreement dated June 4, 1971 and known as Trust No. 57420 and Lincoln-Cicero Corporation, a corporation of Delaware, J.C. Penney Properties, Montgomery Ward Development Corporation, Lincoln Mall Properties, Inc., a corporation of Delaware, and Chicago Title and Trust Company, a corporation of Illinois, as Trustee under Trust Agreement dated July 30, 1971 and known as Trust No. 57855 recorded June 26, 1979 as Document 25022985.

13. A non-exclusive easement over the Ring Road for ingress and egress granted by designation easement recorded November 10, 1979 as Document 24188603, as shown on survey made by Zarko Sekerez and Associates, No. 107463, dated January 12, 1998, as amended.

-2-